FILED

07/17/2017

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2017

## STATE OF TENNESSEE v. ANNA CHICK

**Appeal from the Circuit Court for Williamson County**
**No. I-CR109180     Joseph A. Woodruff, Judge**

_____

### No. M2016-01907-CCA-R3-CD

_____

The defendant, Anna Chick, appeals her Williamson County Circuit Court conviction of failure to appear, *see* T.C.A. 39-16-609, arguing that Code section 39-16-609 is unconstitutional; that the evidence was insufficient to support her conviction; that the trial court erred by admitting certain evidence in violation of the defendant's constitutional right to confront the witnesses against her; that the State failed to establish that the offense was committed before the finding of the indictment; and that the six-year sentence imposed in this case constitutes unconstitutionally cruel and unusual punishment. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Joseph D. Baugh, Franklin, Tennessee, for the appellant, Anna Chick.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Kim R. Helper, District Attorney General; and Mary Katharine White, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

Originally charged with two counts of failure to appear, the defendant was convicted following a bench trial of a single count of failure to appear.

Roberta Faulkner, deputy clerk in the Williamson County Circuit Court Clerk's Office, testified that she prepared the docket for the criminal court as well as the record for court proceedings. She said that the proceedings of a "regular motion day" would be recorded by a court reporter who, in turn, would reduce the recordings to

compact discs that are then stored in the clerk's office and available to any member of the public. Additionally, any member of the public may request transcripts of court proceedings. Ms. Faulkner identified an agreed order filed on August 6, 2015, which ordered the defendant to appear in the Williamson County Circuit Court for a hearing on her probation violation on September 3, 2015. Ms. Faulkner also identified the four probation violation warrants filed in the defendant's case.

Ms. Faulkner identified a copy of the docket book for the Williamson County Circuit Court for September 3, 2015. The docket book included a clerk's handwritten note that a "forfeit and capias was issued and a $50,000 bond was set" in the defendant's case. She also identified copies of the Order for Forfeiture and Conditional Judgment and the Capias issued on September 9, 2015. Ms. Faulkner testified that copies of each were sent to the defendant's last known address. Ms. Faulkner identified a copy of the document executed by bondsman Hope Redden of Grumpy's Bail Bonding and signed by a deputy sheriff, which document indicated that the defendant was surrendered to the Williamson County Sheriff at 9:30 a.m. on October 2, 2015. The document was signed by the defendant at 9:43 a.m. on October 2, 2015. Ms. Faulkner, who had personally witnessed the defendant's signature on at least one occasion and had observed it on other documents, said that the defendant's signature on the October 2, 2015 document matched the defendant's signature on the other documents in the court's records.

The State then offered into evidence a copy of the transcript of court proceedings on September 3, 2015. Following an objection from the defendant, the court went through the transcript line by line to determine which portions would be available as exceptions to the hearsay rule. Those portions contained the following exchange:

THE CLERK:    #46, State of Tennessee versus Anna Chick.
MS. CHICK:    My lawyer got called down to another Courtroom. He will be right back.
THE COURT:    All right, I will mark your case for discussion, Ms. Chick, thank you.

At noon on September 3, 2015, the court took a "one hour" lunch recess. The court later issued a capias and order for forfeiture and conditional judgment.

Ms. Faulkner conceded during cross-examination that nothing in any of the exhibits indicated to the defendant that she should return to court at a specific time on September 3, 2015, after she had appeared at the call of the docket.

During redirect examination, Ms. Faulkner testified that she assisted the defendant on July 16, 2015, in connection with the probation violation warrants filed in the defendant's case. On that date, Ms. Faulkner explained to the defendant that she was required to appear on August 6, 2015, to answer the charges in the violation warrants. Ms. Faulkner also said that she told the defendant that she was to appear at 9:00 a.m. unless the defendant wanted appointed counsel, in which case she should appear at 8:30 a.m. She said that court typically started at 9:00 a.m. each day. Ms. Faulkner also testified that it was the normal practice for the court to issue "a forfeit and capias" when individuals failed to appear as scheduled.

Attorney Shane McNeill testified that he was appointed to represent the defendant on charges that she violated the terms of the probationary sentence imposed for her felony convictions of TennCare Fraud. He identified his signature as the defendant's attorney on an agreed order resetting the defendant's case from August 6, 2015, to September 3, 2015. The defendant was present in court on August 6, 2015, and aware that the case was reset to September 3, 2015.

Mr. McNeill testified that although he did not answer the initial call for the defendant's case on September 3, 2015, he was present in the courthouse, albeit in another courtroom, and aware that the defendant's case was scheduled for that day. He said that the defendant was present in the courtroom and answered the initial docket call on her own behalf. He recalled that the court recessed for lunch "around the noon hour." When court reconvened approximately an hour later, the defendant "was not present in the courtroom," and Mr. McNeill "didn't know where she was." He relayed to the court that he could not locate the defendant, and the court issued an order for forfeiture and conditional judgment and a capias. Mr. McNeill then left the courthouse, and no one indicated to him at any time that day that the defendant had returned. Several weeks later, Mr. McNeill was notified by the clerk's office that the defendant had been taken into custody.

During cross-examination, Mr. McNeill said that when he did not see the defendant in the courtroom following the lunch recess, he "looked around the courthouse [for] sometime." He said that he "looked for her several times." He recalled looking for the defendant just after the court recessed for lunch and after he returned to the courthouse after having eaten lunch. He did not look for the defendant after the court ordered the forfeiture and capias.

On redirect examination, Mr. McNeill said that he looked for the defendant for "some period of time" after court reconvened before bringing her absence to the court's attention. He could not recall specifically but thought that he had tried to call the defendant.

Kyle Sanders, the defendant's probation officer, testified that he began supervising the defendant in May 2014. Mr. Sanders said that he issued the four probation violation warrants in the defendant's case and that he was present when the defendant's case was called on September 3, 2015. He described what happened:

> I recall coming into the courtroom; sitting in the jury box, like we typically do; Your Honor went through the docket; [the defendant's] name got called; her lawyer at the time stood up, said she was present; she also raised her hand; and court went on for the remainder of the day. And then we broke for lunch and whenever we came back from lunch, [the defendant] never returned, and that's when [the defendant's absence was] brought to the Judge's attention and issued a capias and revoked her bond.

Mr. Sanders recalled that the lunch recess "was almost an hour." At that time, Mr. McNeill told him that he could not locate the defendant. Mr. Sanders and a sheriff's deputy "helped Mr. McNeill look around the courthouse" in an effort to "locate [the defendant] for him." They did not find her.

Mr. Sanders said that he had no contact with the defendant following the September 3, 2015 court date despite that she was scheduled to report to him on a weekly basis at that time. At some point, the defendant's sister, Bonnie Lindsey, notified him that "she believed that [the defendant] was with her boyfriend, Phillip Potts, in Lewis County, living in a tent, and she just heard from [the defendant] periodically, and Mr. Potts had c[o]me by the trailer that they resided at periodically to pick up things for" the defendant. On September 23, 2015, Mr. Sanders attempted to do a home visit at the residence that the defendant had shared with Ms. Lindsey and confirmed that the defendant had vacated the residence. Ms. Lindsey told Mr. Sanders that the defendant "reported . . . that she was at a location that we wouldn't be able to find her." Ms. Lindsey indicated that she had also been contacted by the defendant's bonding company and that the bondsman told her that the defendant and Mr. Potts had "evad[ed] them" and had "almost struck the agent with their vehicle."

Mr. Sanders said that on those occasions that the defendant had reported before her court date, he had reminded her that her court date was near. He was contacted by the sheriff's department on or about October 15, 2015, and advised that the defendant had been taken into custody.

-4-

Upon questioning by the trial court, Mr. Sanders said that he and a sheriff's deputy thoroughly checked all of the public areas of the courthouse to see if they could find the defendant. He saw the defendant exit the courtroom but not the courthouse.

Hope Redden, a bail bonding agent employed by Grumpy's Bail Bonds, testified that Grumpy's Bail Bonds posted the defendant's $5,000 bond in case number I-CR067383 on June 15, 2015. Grumpy's Bail Bonds received the forfeiture and conditional judgment issued by the Williamson County Circuit Court on September 11, 2015. Because Ms. Redden knew the defendant, she "just called her directly" because Ms. Redden was aware that the defendant "had had some health problems in the past." When Ms. Redden spoke with the defendant on September 14, 2015, the defendant "advised that she was in Florida on vacation and that she would be back on September the 21st, and she would come to the clerk's office and speak with them on the 22nd." When she finished speaking with the defendant, Ms. Redden telephoned Ms. Lindsey, who had co-signed the defendant's bond. Ms. Lindsey told Ms. Redden that the defendant "was not in Florida, that she was actually hiding."

When the defendant failed to report to the clerk's office as promised on September 22, 2015, Ms. Redden contacted Ms. Lindsey, who "advised that [the defendant's] boyfriend was on the way to her home to get some of the defendant's belongings." Ms. Redden and her coworker then went to Ms. Lindsey's residence. When they arrived, they saw the defendant's boyfriend with "several laundry baskets full of clothes." He refused to tell Ms. Redden "where she was." During this interaction, Ms. Redden observed that the truck being driven by the defendant's boyfriend had a temporary tag issued in the defendant's name that also listed the name of the car dealership. Ms. Redden contacted the dealership and learned that the truck was fitted with a global positioning system locater device ("GPS") by the dealership. The dealership provided Ms. Redden with "four addresses of frequent places that the GPS pinged."

Ms. Redden visited one of those addresses and encountered the defendant and her boyfriend on the road in the same truck. The defendant was driving. Ms. Redden turned her vehicle around to follow the defendant. When the defendant stopped at a stop sign, Ms. Redden believed that the defendant had pulled over because she had recognized Ms. Redden and had decided to "surrender[]." At that point, Ms. Redden got out of her vehicle and approached the driver's side of the defendant's vehicle. The defendant said, "'Oh, hell no. F*** you, b****.'" Ms. Redden described what happened next: "She backed up and gunned the truck towards me to where I had to jump out of the way. It was within inches of mowing me down." Ms. Redden then returned to her office.

Later, Ms. Redden executed a "Surrender to Sheriff" form because she "wanted a guarantee [Grumpy's Bail Bonds] would not be put back on the bond." The court granted the surrender. She said that she was made aware that the defendant was in the Williamson County Jail on September 25, and Ms. Redden located the defendant at the Williamson County Jail.

Based on this evidence, the trial court granted the defendant's motion for judgment of acquittal as to count two, failure to appear in case number I-CR018565, concluding that the State had failed to present any proof relative to that count. The trial court found the defendant guilty in count one, failure to appear in case number I-CR067383.

At sentencing, the defendant argued that the State's notice seeking enhanced punishment was insufficient and that, as a result, she should be sentenced as a Range I offender. The defendant agreed that she had the requisite number of prior convictions to qualify as a career offender but argued, without citing any authority, that the trial court should use certain mitigating factors, including the defendant's poor health, "to move the case down Range." Additionally, the defendant argued that the portion of the sentencing act setting the terms for sentencing career offenders was unconstitutional because it deprived the trial court of the discretion to impose anything other than the maximum sentence for the conviction class. The State argued that the notice seeking enhanced punishment was effective, that the defendant had the necessary number of convictions to qualify as a career offender, and that a fully-incarcerative sentence was appropriate based upon the defendant's long history of criminal conduct, the egregious and blatant nature of her offense, and her numerous probation revocations.

At the conclusion of the hearing, the trial court concluded beyond a reasonable doubt that the defendant was a career offender and, accordingly, imposed the statutorily mandated six-year sentence. The court ordered a fully-incarcerative sentence, observing that given "the repeated instances when the defendant has been granted probation . . . the evidence preponderates substantially, clearly and convincing is beyond any finding that the defendant might reasonably be expected to [be] rehabilitated." The court determined that no evidence "support[ed] any kind of conclusion . . . that the defendant would abide by the terms of probation." The court also concluded that anything other than confinement would depreciate the seriousness of the offense. The trial court ordered the defendant to serve her sentence consecutively to the previously-imposed TennCare fraud sentence.

The defendant filed a timely but unsuccessful motion for new trial followed by a timely appeal. In this appeal, the defendant contends that Code section 39-16-609 is unconstitutional; that the evidence was insufficient to support her conviction; that the

-6-

admission of certain documentary evidence violated her constitutional right to confront the witnesses against her; that the State failed to establish that the offense occurred before the finding of the indictment; and that the sentence imposed in this case amounts to cruel and unusual punishment.

## *I. Constitutionality of Code Section 39-16-609*

The defendant asserts that Code section 39-16-609 is unconstitutionally vague because it does not define the terms "failure to appear," "appearance," or "lawful authority." The State contends that the defendant does not actually make two separate challenges to the constitutionality of the statute and that, in any event, Code section 39-16-609 is not unconstitutionally vague.

By way of framing our analysis, we agree with the State that although the defendant purports to challenge the statute as unconstitutional on its face and as applied in her case, her dual arguments can be condensed to a single essential claim that Code section 39-16-609, due to its vagueness, failed to place her on notice that her conduct would violate the statute.

"Issues of constitutional interpretation are questions of law, which we review de novo without any presumption of correctness given to the legal conclusions of the courts below." *Waters v. Farr*, 291 S.W.3d 873, 882 (Tenn. 2009) (citing *Colonial Pipeline Co. v. Morgan*, 263 S.W.3d 827, 836 (Tenn. 2008)). "In evaluating the constitutionality of a statute, we begin with the presumption that an act of the General Assembly is constitutional." *See Gallaher v. Elam*, 104 S.W.3d 455, 459 (Tenn. 2003) (citing *State v. Robinson*, 29 S.W.3d 476, 479 (Tenn. 2000); *Riggs v. Burson*, 941 S.W.2d 44, 51 (Tenn. 1997)). To this end, we "indulge every presumption and resolve every doubt in favor of the statute's constitutionality." *State v. Taylor*, 70 S.W.3d 717, 721 (Tenn. 2002).

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). A "vague statute is vulnerable to a constitutional challenge because it (1) fails to provide fair notice that certain activities are unlawful; and (2) fails to establish reasonably clear guidelines for law enforcement officials and courts, which, in turn, invites arbitrary and discriminatory enforcement." *State v. Pickett*, 211 S.W.3d 696, 702 (Tenn. 2007). "The primary purpose of the vagueness doctrine is to ensure that our statutes provide fair warning as to the nature of forbidden conduct so that individuals are not 'held criminally responsible for conduct which [they] could not reasonably understand to be proscribed.'" *State v. Crank*, 468 S.W.3d 15, 22-23 (Tenn. 2015) (quoting *United States v. Harriss*, 347 U.S. 612, 617 (1954)).

"Despite the importance of these constitutional protections," our supreme court "has recognized the 'inherent vagueness' of statutory language . . . and has held that criminal statutes do not have to meet the unattainable standard of 'absolute precision.'" *Crank*, 468 S.W.3d at 23 (quoting *Pickett*, 211 S.W.3d at 704; *State v. McDonald*, 534 S.W.2d 650, 651 (Tenn. 1976)). "The vagueness doctrine does not invalidate every statute which a reviewing court believes could have been drafted with greater precision, especially in light of the inherent vagueness of many English words." *State v. Lyons*, 802 S.W.2d 590, 592 (Tenn. 1990). When "evaluating a statute for vagueness," this court "may consider the plain meaning of the statutory terms, the legislative history, and prior judicial interpretations of the statutory language." *Crank*, 468 S.W.3d at 23 (citing *Lyons*, 802 S.W.2d at 592); *see* T.C.A. § 39-11-104 (stating that each statute must be "construed according to the fair import of its terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code").

Code section 39-16-609, as is applicable in this case, makes it a crime "for any person to knowingly fail to appear as directed by a lawful authority if the person . . . [h]as been lawfully released from custody, with or without bail, on condition of subsequent appearance at an official proceeding or penal institution at a specified time or place." T.C.A. § 39-16-609(a)(4). "'Knowing' means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." *Id.* § 39-11-106(20). Lawful authorities are "[t]hose persons . . . with the right to exercise public power, to require obedience to their lawful commands, and to command or act in the public name." Black's Law Dictionary (10th ed. 2014); *cf. Lyons*, 802 S.W.2d at 592 ("The concept of 'lawfulness' is not inherently unconstitutionally vague, and 'people of common intelligence need not always guess at what a statute means by lawful' inasmuch as that term must be considered in the context of the statements of law contained in relevant statutes and court rulings.") (citation and internal quotation marks omitted). "'Official proceeding' means any type of administrative, executive, legislative or judicial proceeding that may be conducted before a public servant authorized by law to take statements under oath." *Id.* § 39-11-106(25). Although the defendant is correct that the code does not define the terms "fail," "appear," or "appearance," those are familiar terms capable of ready understanding by a person of ordinary intelligence.

Utilizing the statutory definitions as well as the fair import and common understanding of the terms contained in Code section 39-16-609, we conclude that the statute does not "prohibit[] conduct 'in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Crank*, 468 S.W.3d at 22 (quoting *Pickett*, 211 S.W.3d at 704).

## II. Sufficiency

The defendant contends that "without the evidence introduced in violation of the Confrontation clause" the evidence was insufficient to support her conviction.

As an initial matter, the defendant has waived our consideration of this issue by failing to support her single-sentence assertion with argument, citation to authorities, or citation to the record. *See* Tenn. R. App. P. 27(a)(7) (stating that the appellant's brief must contain an argument "setting forth . . . the contentions of the appellant with respect to the issues presented, and the reasons therefor . . . with citations to the authorities . . . relied on"); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Moreover, even if we concluded that the challenged evidence was erroneously admitted, it would nevertheless be included in our calculus of the sufficiency of the evidence. *See State v. Longstreet*, 619 S.W.2d 97, 101 (Tenn. 1981).

## III. Confrontation Clause

The defendant claims that "several of the exhibits introduced by the State," "specifically exhibits 2, 3, 4, 5, 6, 7, and 8" violated her constitutional right to confront the witnesses against her. She argues that "each exhibit was testimonial" and should have been excluded.

The Sixth Amendment to the federal constitution and article I, section 9 of the Tennessee Constitution afford the criminal accused the right to confront the witnesses against him. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Although the provisions are not coterminous, our supreme court has "expressly adopted and applied the same analysis used to evaluate claims based on the Confrontation Clause of the Sixth Amendment." *State v. Dotson*, 450 S.W.3d 1, 62 (Tenn. 2014) (citing *State v. Parker*, 350 S.W.3d 883, 898 (Tenn. 2011); *State v. Franklin*, 308 S.W.3d 799, 809-10 (Tenn. 2010); *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008); *State v. Lewis*, 235 S.W.3d 136, 145 (Tenn. 2007)). In *Crawford v. Washington*, the United States Supreme Court departed from decades-long precedent and held for the first time that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands . . . unavailability and a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 68 (2004). "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law." *Id.* Because the Confrontation Clause does not bar nontestimonial hearsay, *see Davis v. Washington*, 547 U.S. 813, 823-24 (2006); *Whorton v. Bockting*, 549 U.S. 406, 420 (2007), "the

threshold question in every case where the Confrontation Clause is relied upon as a bar to the admission of an out-of-court statement is whether the challenged statement is testimonial." *Dotson*, 450 S.W.3d at 63 (citing *Cannon*, 254 S.W.3d at 301).

The *Crawford* court identified, for illustrative purposes, a "core class of 'testimonial' statements": "'ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially'"; "'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions'"; and "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Crawford*, 541 U.S. at 51-52. Similarly, the court observed that some "statements . . . by their nature were not testimonial," including, among other things, "business records." *Id.*; *Dotson*, 450 S.W.3d at 64. Thus, statements that are properly categorized as business records are nontestimonial, and the Confrontation Clause has no application to their admission into evidence. *Cannon*, 254 S.W.3d at 303. For those statements that are not easily classified as nontestimonial, our supreme court has concluded that "'a statement is testimonial at least when it passes the basic evidentiary purpose test plus either the . . . targeted accusation requirement'" adopted by the plurality of the Supreme Court in *Williams v. Illinois*, 567 U.S. ___, 132 S. Ct. 2221 (2012), or the "'formality criterion'" espoused by Justice Thomas in his concurring opinion in *Williams*, stating that "'[o]therwise put, if *Williams* does have precedential value . . . an out-of-court statement is testimonial . . . if its primary purpose is evidentiary and it is either a targeted accusation or sufficiently formal in character.'" *Dotson*, 450 S.W.3d at 69 (quoting *Young v. United States*, 63 A.3d 1033, 1043-44 (D.C. 2013)).

Turning now to the challenged evidence in this case, we easily conclude that the admission of exhibit two, the Agreed Order resetting the defendant's case to September 3, 2015; exhibit 3, the probation violation warrants that were the originating process in the defendant's case; exhibit 4, the docket book memorializing the events of the Williamson County Circuit Court on September 3, 2015; exhibit 5, the Forfeiture and Conditional Judgment entered by the Williamson County Circuit Court on September 9, 2015; exhibit 6, the Capias filed on September 3, 2015; and exhibit 7, the Surrender to Sheriff filed on October 19, 2015, did not violate the defendant's constitutional right to confrontation. As the Supreme Court observed, "public records are generally admissible absent confrontation because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324 (2009). Because the challenged documents were created for the administration of the affairs of the Williamson County Circuit Court, they qualify as public records, they are nontestimonial, and they

not subject to the limitations of the Confrontation Clause. *See Melendez-Diaz*, 557 U.S. at 324; *Doe v. United States*, 487 U.S. 201, 215 (1988) ("The consent directive itself is not 'testimonial.'"); *Cannon*, 254 S.W.3d at 303; *see also e.g.*, *United States v. Causevic*, 636 F.3d 998, 1002-04 (8th Cir. 2011) (certified criminal judgment not testimonial); *United States v. Weiland*, 420 F.3d 1062, 1076-77 (9th Cir. 2005) (records of conviction non testimonial).

With regard to exhibit 8, the transcript of the proceedings on September 3, 2015, we observe that the trial court admitted only those portions of the transcript that did not qualify as hearsay at all. In consequence, the Confrontation Clause has no application to the admission of those portions of the transcript.

## *IV. Indictment*

The defendant next asserts that the State failed to establish that the offense occurred before the finding of the indictment. The defendant provided a single statutory citation to a one-sentence assertion. She has otherwise failed to support this issue with with argument, citation to relevant authorities, or citation to the record; thus, it is waived. *See* Tenn. R. App. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

## *V. Sentencing*

Finally, the defendant asserts that the sentence imposed in this case constitutes unconstitutionally cruel and unusual punishment. Again, the defendant's brief contains little in the way of argument to support her assertion and no citation to the record in this case. The sentence imposed, six years to be served at 60 percent release eligibility, was the only sentence available given the conviction offense and the defendant's criminal record. Code section 39-16-609 provides that "[i]f the occasion for which the defendant's appearance is required is a Class A misdemeanor or a felony, failure to appear is a Class E felony." T.C.A. § 39-16-609(e). "A career offender is a defendant who has received . . . [a]t least six (6) prior felony convictions of any classification if the defendant's conviction offense is a Class D or E felony." *Id.* § 40-35-108(a)(1). "A defendant who is found by the court beyond a reasonable doubt to be a career offender shall receive the maximum sentence within the applicable Range III." *Id.* § 40-35-108(c). "A Range III sentence is . . . [f]or a Class E felony, not less than four (4) nor more than six (6) years." *Id.* § 40-35-112(c). This court has previously rejected similar Eighth Amendment challenges to increased punishments for career offenders based upon the rationale that the enhanced sentence is the result not only of the severity of the conviction offense but also the defendant's pattern of criminal conduct. *State v. Smith*, 48 S.W.3d 159, 172 (Tenn. Crim. App. 2000) (stating that "the severity of the appellant's punishment is the direct result not merely of an isolated instance of" criminal

conduct "but of a pattern of" such conduct "evidenced by his seven prior convictions of felony drug offenses and his consequent status as a career offender").

The trial court ordered the defendant's six-year sentence to be served consecutively to her prior sentence for TennCare fraud based upon its finding that the defendant had an extensive record of criminal activity, *see* T.C.A. § 40-35-115(b), and that she was released on bond at the time she committed the offense in this case, *see* Tenn. R. Crim. P. 32(3)(C). Although the record contains insufficient information to conclude that consecutive sentences were mandated under the terms of Rule 32,[1] it clearly supports the trial court's conclusion regarding the defendant's criminal record. The presentence report reflects some 45 prior convictions dating back 25 years. Under these circumstances, we cannot say that the order of consecutive sentences was grossly disproportional to the offense committed. *See State v. Harris*, 844 S.W.2d 601, 603 (Tenn. 1992) (holding that unless a comparison of "the sentence imposed . . . with the crime committed. . . . leads to an inference of gross disproportionality, the inquiry ends— the sentence is constitutional").

*Conclusion*

Based upon the foregoing analysis, we affirm the judgment of the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE

_____

[1] When she committed the offense in this case, the defendant was on bond from charges that she had violated the terms of the probationary sentence imposed for her convictions of TennCare fraud. The record contains no disposition of those charges.